IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ARKADI NISENZON and      :
LILIA SHUKHATIAN      :
     :
     Plaintiffs      :
     :
     v.      :     CIVIL ACTION NO.  05-5832
     :
MORGAN STANLEY DW, INC.      :
     :
     Defendant/      :
     Third-Party Plaintiff      :
     :
     :
     v.      :
     :
CITIZENS FINANCIAL GROUP, INC.,    :
CITIZENS BANK OF RHODE      :
ISLAND, CITIZENS BANK OF      :
PENNSYLVANIA and MICHAEL      :
KOGAN      :
     :
     Third-Party Defendants      :

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE          March 13, 2008

**Introduction**[1]

     Plaintiffs, Arkadi Nisenzon and Lilia Shukhatian ("Plaintiffs"), husband and wife, have sued

defendant, Morgan Stanley DW, Inc. ("Morgan") for damages alleging breach of contract and

violation of 13 Pa. C.S.A. § 4401.  Plaintiffs claim that Morgan improperly paid two fraudulently

---

[1] Throughout this document we make reference to the exhibits provided by the parties and to our own findings of fact and conclusions of law.  For ease of reference, we refer to Plaintiffs' exhibits as "Ex. P-", to Morgan's exhibits as "Ex. MS-", and to Citizens's exhibits as "Ex. C-". We refer to our findings of fact as "FF" and to our conclusions of law as "CL".

indorsed checks drawn on their account at Morgan and improperly debited $300,000, the aggregate amount of the two checks, from that account.  Morgan has denied liability to Plaintiffs and at the same time has asserted a third-party indemnification claim against Citizens Financial Group, Inc., Citizens Bank of Rhode Island, and Citizens Bank of Pennsylvania ("Citizens"),[2] claiming that Citizens, as the depositary bank, breached its presentment warranties owed to Morgan and is, therefore, liable to the extent of any liability Morgan may have to Plaintiffs.  Citizens asserts that Morgan does not have the benefit of any presentment warranties owed by Citizens under Pennsylvania law because it is not a "bank" under the Pennsylvania version of the Uniform Commercial Code ("UCC") and is not, therefore, subject to that body of law governing this kind of transaction.  In the alternative, Citizens argues that it succeeds to any defenses Morgan may have against Plaintiffs and asserts that Plaintiffs are precluded from recovery due to what is generally referred to as the "padded payroll" defense, the "intended payee" defense and their own contributory negligence.  Finally, both defendants assert that any recovery for Plaintiffs must be discounted by prior monetary recoveries made by Plaintiffs.

A non-jury trial was held before this Court pursuant to its consent jurisdiction on November 14-15, 2007.[3]  Upon the preparation of the transcript of the trial proceedings the parties submitted additional post-trial briefings including proposed findings of fact and conclusions of law dealing with the issues pertinent to the case.  We now set out our findings, conclusions and order for the

_____

[2] Pursuant to a stipulation made on the record at the start of trial, both Citizens Financial Group, Inc. and Citizens Bank of Rhode Island were dismissed from the case, leaving only Citizens Bank of Pennsylvania.  (N.T. at 7 – Day 1).

[3] The trial concerned only Plaintiffs' claims against Morgan and Morgan's claim against Citizens.

entry of judgment.[4]

## Findings of Fact

### I.    Parties

1.    At the time of the filing of the complaint, Plaintiffs Arkadi Nisenzon and Lilia Shukhatian, husband and wife, were residents of the State of New Jersey.  (Joint Trial Stip. 1, 2).

2.    Defendant Morgan Stanley DW, Inc. was, until April 1, 2007, a Delaware corporation with its principal place of business in the State of New York.  Morgan Stanley DW Inc. merged with Morgan Stanley & Co. Incorporated on April 1, 2007.  During the period at issue, the account giving rise to Plaintiffs' claim was held and serviced by the former Morgan Stanley DW Inc., broker-dealer entity, not Morgan Stanley & Co. Incorporated.  (Joint Trial Stip. 3).

3.    Third-party defendant Citizens Bank of Pennsylvania is a domestic financial institution organized under the laws of Pennsylvania and that maintains its principal place of business in Philadelphia, Pennsylvania.  (Joint Trial Stip. 4).

4.    Third-party defendant Michael Kogan ("Kogan") is a natural person who currently is incarcerated in the United States Penitentiary - Canaan, 3057 Easton Turnpike, Waymart, PA 18472.  (Joint Trial Stip. 5).

### II.    Procedural Background

5.    On or about October 3, 2005, Plaintiffs filed this lawsuit in the Court of Common

---

[4] We note that Plaintiffs' two claims arise out of the same set of operative facts, namely Morgan's improper payment of the fraudulently indorsed checks, and seek damages for the same loss.  Whether any liability on the part of Morgan is based upon a strict contractual breach (which Plaintiffs failed to set out specifically) or a violation of duties Morgan may have under 13 Pa. C.S.A § 4401 is of no significance.  Understandably, the parties have briefed the issues with reference to the Pennsylvania UCC.  We resolve the case in the same way and deem the claims to be redundant.  We thus consider the breach of contract claim to be merged into the § 4401 claim.

Pleas of Philadelphia County, Pennsylvania, alleging that Morgan was liable for breach of contract and for violating 13 Pa. C.S.A. § 4401.  Plaintiffs assert that Morgan paid the two fraudulently indorsed checks and improperly charged Plaintiffs' account in the aggregate amount of the checks's value, which was $300,000.  (Joint Trial Stip. 22).

6.      On or about November 4, 2005, Morgan timely removed the pending action to this Court and filed a Third Party Complaint against Citizens and Kogan.  (Joint Trial Stip. 23).

7.      On November 19, 2007, the parties voluntarily consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. 636(c) and Fed. R. Civ. P. 73.  (Doc. 45).  The matter was referred to this Court on November 22, 2007.  (Doc. 46).

8.      Subject matter jurisdiction is proper under 28 U.S.C. Section 1332(a), 28 U.S.C. Section 1367(a), and Federal Rule of Civil Procedure 14.  Venue is proper under 28 U.S.C. Section 1391(a) in that a substantial part of the events or omissions giving rise to the parties' claims occurred in this District.  (Joint Trial Stip. 24).

## III.    Factual Background

9.      In or around May 2000, Plaintiffs opened and thereafter, through approximately November 4, 2005, jointly maintained with Morgan an "Active Asset" brokerage account, No. ***-**7847 (the "Active Asset account") which permitted them to write checks which would be charged by Morgan upon their Active Asset Account.  (Joint Trial Stip. 6; Ex. C-1).

10.     The checks provided to Plaintiffs featured the name "Morgan Stanley Active Assets Account" in the upper left hand corner of the check.  (Exs. P-74, C-17).

11.     When Plaintiffs opened their account, they signed a Morgan account application in which they acknowledged that they "ha[d] received the Client Account Agreement and agree to abide

by its terms as currently in effect or as they may be amended from time to time." (Exs. C-28, MS-2).

12.     An Active Asset account is a multi-faceted brokerage account, not a traditional checking or savings account, which Morgan offers to its individual brokerage clients. (Ex. MS-3).

13.     In offering such accounts, Morgan has, where appropriate, entered into arrangements with licensed banks and other agents to assist in offering certain check-writing privileges on the accounts. Morgan had such an arrangement in this case with Bank One. Morgan, however, upon final presentation of the checks, had the ultimate authority to pay or decline payment on a particular check. (Exs. MS-3, C-29; N.T. 197, 202, 203, 208-09, 223 – Day 2).

14.     The Client Account Agreement which Morgan typically enters into with its clients, including these Plaintiffs, provides that "the checking feature is intended to provide clients with easy access to the assets in their accounts; the Active Asset Account is not a bank account." (Exs. MS-3 at 8, C-29).

15.     Plaintiffs' Client Account Agreement also provided that: "Whenever you have a question about your account, you should call your Financial Advisor. When your Financial Advisor is not available, other branch personnel should be able to help you." (Exs. MS-3 at 13, C-29).

16.     Plaintiffs' Client Account Agreement also provided that: "Clients suspecting an error on their monthly statement or trade confirmation should promptly contact the manager of the branch servicing the account. We may presume the statement correct unless we receive written notification about the suspected error within 10 days." (Exs. MS-3 at 4, C-29).

17.     During the time Plaintiffs' account with Morgan remained open, Plaintiffs wrote checks on their account to various payees, which Morgan, upon final presentation through the federal clearinghouse system, debited from Plaintiffs' account in the normal course. (Joint Trial Stip. 7;

5

N.T. 200-03, 208-09 – Day 2).

18.     During the time Plaintiffs' account with Morgan remained open, they received monthly account statements showing the trading activity on their account as well as any deposits or withdrawals made by them from their account using the checks provided to them by Morgan.  (Exs. P-4, P-18).

19.     On or about July 21, 2000, third-party defendant Michael Kogan established, in the name of his company, Kogan & Company, Inc., a business checking account with Mellon Bank (n/k/a third-party defendant Citizens Bank).  The account number provided  was 610165-321-1. (Exs. MS-1, C-32, P-28).

20.     During 2002, Plaintiff Arkadi Nisenzon utilized Kogan as an investment advisor. Kogan represented himself to be a highly successful day trader associated with a broker dealer known as Penn Financial Group ("Penn Financial "), in Jenkintown, Pennsylvania.  (Joint Trial Stip. 8).

21.     Upon Nisenzon's initial introduction to Kogan and Penn Financial, Kogan introduced himself as the president and owner of Penn Financial but explained at that same time that Eric Laucius was, in fact, falsely held out to hold those positions.  (N.T. at 132-37 – Day 1).

22.     Nisenzon did no investigation into the background of Kogan or Penn Financial. Rather, he relied exclusively on the referral to Kogan from his Morgan broker, Ilana Margolin.  (N.T. at 126-28, 130-31, 140-42 – Day 1).

23.     Although initially referred to Kogan because of his personal financial losses as a day trader, Nisenzon did not invest his own money, but rather invested $270,000 of his father-in-law's money with Kogan.  In light of the significant returns reflected on fraudulent statements issued by

Penn Financial, Nisenzon decided to invest some of his own funds with Kogan. (N.T. at 142-44, 149-50, 155-61, 168-70, 177-79, 181 – Day 1).

24.     Nisenzon invested his own funds despite the fact that: trade statements for his father-in-law's account reflected unusually high rates of return (approximately 130%), with most individual trades earning a profit; the trade statements frequently failed to list "debit" and "credit" totals and contained certain other inconsistencies; he was provided with no receipts or confirmation tickets for various purchases and sales; and Nisenzon was not required to pay any commission to Penn Financial, FISERV Securities Inc. ("FISERV") (the clearinghouse) or Kogan & Company. (N.T. at 156-61, 168-70, 177-78, 214 – Day 1).

25.     Sometime prior to September 2002, Nisenzon offered to make Kogan a member of LA Commodities, LLC ("LAC"), an existing limited liability company that had been formed by Nisenzon in March 2002, through which they would equally invest and have Kogan conduct day trading. (Ex. C-9 at 1; N.T. at 181-86, 190-91 – Day 1).

26.     LAC had not actively done any business since it was formed. (N.T. 181 – Day 1).

27.     The Operating Agreement pertaining to LAC (the "LAC Agreement") was prepared and executed in September 2002. It identified both Nisenzon and Kogan as Members and noted that each had contributed $200,000 to the venture. (Ex. C-9 at 3, Schedule A).

28.     It further provided that both Nisenzon and Kogan were Managers "vested with full authority to collectively manage the business affairs of the Company and to bind the Company." (Ex. C-9 at 4).

29.     The LAC Agreement further specified that both Nisenzon and Kogan, as Managers, were to "participate in ordinary business and management decisions concerning the company" and

7

were required to "unanimously agree upon such decisions." The agreement also provided, however, that where the two "fail to agree as to a major business decision, the decision of Arkadi Nisenzon controls." (Ex. C-9 at 4).

30.     FISERV is a registered broker/dealer and member of the New York Stock Exchange. It provides processing and support services and technologies, including execution and clearing services, to other securities brokers such as Penn Financial. (Joint Trial Stip. 10).

31.     Plaintiff Nisenzon was advised by Kogan that he needed to open an account at FISERV and that FISERV would provide clearing and cashiering services for his investments. (Joint Trial Stip. 11).

32.     On or around July 23, 2002, Plaintiff Nisenzon established an account at FISERV in the name of LAC, No. 51752087. Nisenzon, however, was told by Kogan that his account number at FISERV was 51752073. Account number 51752073 was actually an account which Kogan had established for Equity Allocation Partners ("EAP"), a trading entity he controlled. There was never any activity on the LAC account numbered 51752087. Plaintiffs never received any statements from FISERV relating to this account. (Joint Trial Stip. 12; Exs. C-43, P-64; N.T. 73-75 – Day 1).

33.     Plaintiff Nisenzon was advised by Kogan that checks for deposit to his investment account should be made payable to FISERV and delivered to Kogan. (Joint Trial Stip. 13).

34.     On or around July 25, 2002, Nisenzon drew check no. 132 on Plaintiffs' Morgan account and, as he later did with check nos. 151 and 154, made the check payable to FISERV Securities, Inc., in the amount of $200,000, and in the memo line wrote the following notation: "Acc. # 517-52073 of LA Commodities, LLC". (Exs. C-46, P-71).

35.     Check No. 132 was negotiated and indorsed by a FISERV stamp and accepted for

8

deposit.  In that there was never any action on LAC Account No. 51752087, we acknowledge and accept Citizens's understandable assertion that the funds were likely credited to Account No. 51752073 at FISERV.  (Exs. C-46, P-64, P-71).

36.     On or around October 9, 2002, Nisenzon drew check no. 151 in the amount of $200,000 on Plaintiffs' Morgan account, made the check payable to FISERV Securities, Inc., and in the memo line wrote:  "Acc. # 51752073 of LA Commodities, LLC".  (Joint Trial Stip. 14; Exs. P-1, P-74).

37.     Plaintiffs subsequently delivered check no. 151 to third-party defendant Kogan for the purpose of having the check deposited into Nisenzon's LAC account at FISERV.  (Exs. P-1, C-15, MS-7).

38.     Kogan, however, indorsed check no. 151 by writing "For Deposit Only" in addition to the account number of his company, Kogan & Company, Inc., on the back of the check and, on or around October 10, 2002, deposited it into his company's account with Citizens, Account No. 6101653211.  (Joint Trial Stip. 15; P-10, P-14).

39.     This deposit into Account No. 6101653211 is reflected in a Kogan & Company, Inc. account statement from Citizens for the period of October 1, 2002 through October 31, 2002.  The statement shows that check no. 151 was deposited as part of a $200,100 deposit on October 10, 2002.  (Exs. C-31, P-12-14; N.T. 168 – Day 2).

40.     This same account statement also reflects an outgoing wire transfer of $200,000, the very same amount as check no. 151, on October 16, 2002.  (Ex. C-31, P-13).

41.     The Transaction Detail Report relating to the October 16 wire transfer from the Kogan & Company account reveals that the funds were wired to PNC Bank N.A. for the benefit of

9

FISERV Securities.  The Report further reveals that the funds were for further credit to Account No. 51752073, the EAP account, rather than the LAC account.  (Ex. C-43).

42.     Citizens permitted Kogan to negotiate and deposit check 151 into his company's account over the forged payee indorsement.  Citizens subsequently transferred check no. 151 to the Federal Reserve Bank of Philadelphia for collection and payment in the normal course. (N.T. 164-66 – Day 2; Exs. P-1, C-15, MS-7).

43.     On or around October 11, 2002, Morgan, upon presentment and request for payment by Citizens through the federal clearinghouse system, paid the full amount of check no. 151 in the normal course and debited Plaintiffs' Morgan account for the amount of the check.  (Ex. P-4).

44.     Plaintiffs received from third-party defendant Kogan a fraudulent account statement for the period September 30, 2002 through October 31, 2002 purporting to be from Penn Financial, and purporting to reflect Kogan's deposit of check no. 151 into Plaintiffs' LA Commodities account. (Exs. P-46-48).

45.     On or around November 25, 2002, Nisenzon drew check no. 154 on Plaintiffs' Morgan account in the amount of $100,000, again made the check payable to FISERV Securities, Inc., and in the memo line wrote the following notation: "Acc. # 517-52073 of LA Commodities, LLC".  (Joint Trial Stip. 16; Exs. P-15, P-70, C-18, MS-11).

46.     Plaintiffs subsequently delivered check no. 154 to Kogan, again for the purpose of having the check deposited into Nisenzon's LA Commodities account at FISERV. (Exs. P-15, C-18; N.T. 62-63 – Day 1).

47.     Kogan, however, indorsed check no. 154 by writing "For Deposit Only" in addition to the account number of his company, Kogan & Company, on the back of the check and, on or

around November 27, 2002, deposited check no. 154 into his company's account with Citizens, No. 6101653211.  (Joint Trial Stip. 17; P-16-17, P-26, MS-11, N.T. 66 – Day 1).

48.     This deposit into Account No. 6101653211 is reflected in an account statement from Citizens for the period of November 1, 2002 through November 31, 2002.  The statement shows that check no. 154 was deposited as part of a $178,000 deposit on November 27, 2002.  (Exs. P-26, C-32; N.T. 173 – Day 2).

49.     This account statement also reflects an outgoing wire transfer of $3,500 on the same day.  (Exs. C-32, C-45, P-29).

50.     The Transaction Detail Report relating to the November 27 wire transfer from the Kogan & Company account at Citizens reveals that the funds were wired to PNC Bank N.A. for the benefit of FISERV Securities.  The Report further reveals that the funds were for further credit to Account No. 51752073, the EAP account, rather than the LAC account.  (Ex. C-45).

51.     Citizens permitted Kogan to negotiate and deposit check no. 154 into his company's account over the forged payee indorsement.  Citizens subsequently transferred check no. 154 to the Federal Reserve Bank of Philadelphia for collection and payment in the normal course.  (Exs. P-15, P-70; N.T. 163-68 – Day 2).

52.     On or around November 29, 2002, Morgan, upon presentment and request for payment by Citizens through the federal clearinghouse system, paid the full amount of check no. 154 in the normal course and debited Plaintiffs' Morgan account for the amount of the check.  (Joint Trial Stip. 16; P-18).

53.     Plaintiffs received from third-party defendant Kogan a fraudulent account statement for the period of October 31, 2002 through November 29, 2002 purporting to be from Penn

11

Financial, and purporting to reflect Kogan's deposit of check no. 154 into Plaintiffs' LAC account. (Exs. P-49-51, C-19).

54.     Citizens's "Branch Teller Procedures Manual" acknowledges the warranties given by the indorser of a check, including the guarantee that "[a]ll signatures or previous indorsers and the maker are authentic and authorized" and specifically cautions bank employees to "keep in mind that the Bank's indorsement gives all the guarantees . . . to subsequent holders."  (Ex. MS-25 at 5).

55.     Citizens's "Branch Teller Procedures Manual" also mandates that any deposited check for $100,000 or greater "must be initialed by management to evidence concurrence that the check is indorsed as drawn and that it is being deposited to an account titled in the name of the payee."  (Ex. MS 25 at 2).

56.     In fact, neither check no. 151 nor 154 were "indorsed as drawn," neither checks' indorsement was verified by Citizens, and no Citizens manager initialed or otherwise concurred that the checks were indeed "being deposited to an account titled in the name of the payee."  (Exs. MS-7, MS-11; N.T. at 154-61 – Day 2; Record in general).

57.     Charles DeLuca, an investigator employed by Citizens, conceded that in accepting check nos. 151 and 154 for deposit into the checking account of Kogan & Company, Inc., over the forged or improper payee indorsements, Citizens failed to follow the established policies and procedures relating to the verification of payee indorsements, referred to in Finding Nos. 53 and 54 and set forth in its "Branch Teller Procedures Manual."  (N.T. at 154-61 – Day 2).

58.     Both the October 16 wire transfer and the November 27 wire transfer from the Kogan & Company account at Citizens were deposited into Account No. 51752073 at FISERV, the EAP account controlled by Kogan – rather than the LAC account controlled by Nisenzon.  (Exs. C-43, C-

45).

59.     Nisenzon did not discover that Kogan's license for trading had been suspended for fraudulent activities prior to issuing check nos. 151 and 154.  (Doc. 59-61 at 18; N.T. 192-93 – Day 1).  He did not, however, have reason to question Kogan's November 2002 representation that he did have the proper licenses, and he had no reason, when shown the actual licenses, to question their authenticity or whether they were in good standing.  (Exs. C-9 at 190, P-196, P-197; N.T. 192-95 – Day 1).

60.     Nisenzon first discovered that Kogan's license had been suspended some time after January 2, 2003, which was after the issuance of check nos. 151 and 154.  (N.T. 192-93 – Day 1).

61.     Plaintiffs first discovered the fraud perpetrated by Kogan with regard to check nos. 151 and 154 in or around May, 2003, after being contacted by FBI special agent Kevin Bosch.  (N.T. 54, 221 – Day 1).

62.     As a result of this contact, Plaintiffs, in early June 2003, contacted their Morgan broker, Ilana Margolin ("Margolin"), and requested copies of check nos. 151 and 154.  (N.T. 55-56 – Day 1).

63.     Some time after receiving these check copies, but still in June 2003, Nisenzon informed Margolin that he had been approached by an FBI agent and notified that there was "a possibility of fraud going on with Penn Financial and [Nisenzon's] capital could have been in danger."  (N.T. 133 – Day 2).

64.     This prompted him to request that Morgan attempt to recover his funds from his Penn Financial account and/or to have them transferred to Morgan.  To assist in this attempted transfer, on June 30, 2003, Nisenzon faxed to Margolin a copy of a statement of his Penn Financial account

13

for the period of February 28, 2003 through March 31, 2003.  (N.T. 133-34 – Day 2; Ex. C-39).  The

attempted funds transfer was rejected, however.  (N.T. 137 – Day 2).

      65.     As a result of the dealings with Kogan, Plaintiffs sustained a total loss of over $1.5

million.  (Ex. MS-18).  With specific regard to the checks at issue in this case, check nos. 151 and

154, both of which comprised part of the $1.5 million loss, Plaintiffs sustained a loss of $300,000.

(Exs. P-1, P-15).

      66.     Plaintiffs submitted a claim against Penn Financial to the Securities Investor

Protection Corporation ("SIPC") for the two checks involved in this matter as part of a $1,500,000

claim submitted under the name of Milex Fund, L.P. ("Milex") (which Nisenzon apparently

controlled).[5]  The $300,000 loss resulting from the issuance of check nos. 151 and 154 was included

as part of this claim.  (Exs. MS-18, MS-19; N.T. 5-7 – Day 2).

      67.     By letter dated July 12, 2004, SIPC notified Plaintiff Nisenzon that it had allowed the

$1.5 million Milex claim; SIPC, however, capped the amount of the recovery at the $500,000 limit

allowed by statute, with accrued interest added to make a total recovery of $504,556.23.  (Ex. MS-

18, MS-19).

      68.     Check nos. 151 and 154, which totaled $300,000, comprised 20% of Plaintiffs'

$1,500,000 SIPC claim.  We are unable to presume, however, that 20%, or $100,000, of Plaintiffs'

---

[5] Although the details of the creation and control of Milex were not developed at trial
beyond a passing explanation that attorney Douglas Coopersmith assisted in the creation of this
fund (*see, e.g.*, N.T. at 173, 228 – Day 1), we note that the "Confidential Private Placement
Memorandum," or, the "Offering Memorandum," describes the fund as a "Delaware Limited
Partnership" with LAC listed as the general partner.  (C-20 at 1-2).  The fact that Nisenzon, in
fact, controlled Milex is evidenced by his ultimate control of LAC and his testimony at trial that
he himself, through his attorney, made the $1,500,000 SIPC claim.  (*See supra* at FF 28-29; N.T.
5-6 – Day 2).

$500,000 pre-interest SIPC award was allocated to cover the losses resulting from check nos. 151 and 154 in that no such specific allocations appear in Plaintiff's SIPC documents and, importantly, Plaintiffs would have received the same $500,000 capped statutory limit whether they had included the losses resulting from these checks or not (i.e. Plaintiffs would have recovered $500,000 whether their total claim was $1.5 million or $1.2 million).

69.    On or about July 9, 2004, Plaintiffs, along with Georgiy Shukhatian and International Alternative Service Group, Ltd. (which was controlled by Plaintiff Lilia Shukhatian), were granted permission to intervene in pending litigation, captioned *Alexander Finance C.D. Inc. v. Sirotovsky*, No. 2:02-cv-04977 (E.D. Pa. 2004) (the "Sirotovsky Action").  (Doc. 58 at 21).

70.    Plaintiffs and other intervenors filed an Amended Complaint in the Sirotovsky Action setting forth the history of the various checks issued to Kogan & Company and demanding judgment in the amount of $1,800,150.  Check nos. 151 and 154 were specifically included in the Amended Complaint.[6]  (*Alexander Finance*, No. 2:02-cv-04977 (Doc. 77)).

71.    As part of the global settlement in the Sirotovsky Action, Plaintiffs received a sum of $241,710.47.  (Ex. MS-20 at 333).

72.    Check Nos. 151 and 154, which totaled $300,000, comprised 16.67% of Plaintiffs' $1,800,150 claim in the Sirotovsky action.  We can and do find that 16.67%, or $40,293.14, of Plaintiffs' $241,710.47 amount was allocated to cover the losses resulting from check nos. 151 and 154.

---

[6] We note that also included in the Amended Complaint was an additional miscellaneous loss claim of $30,150 along with a $270,000 claim by Nisenzon's father-in-law.  These sums appear to explain the disparity between the SIPC claim and the loss alleged in the Sirotovsky Action.

73.     As a result of the settlement of the Sirotovsky action, Plaintiffs have recovered $40,293.14 of the $300,000 total loss of check nos. 151 and 154.

74.     Upon the formation of LAC for purposes of conducting day trading for the benefit of Nisenzon and Kogan, a bank account was established at Fleet Bank.  (N.T. 225-26 – Day 1).

75.     We accept Citizens's position that on March 17, 2003, Kogan caused a wire transfer to be issued from the Milex Fund account to the credit of the LAC Fleet Bank account in the amount of $30,000.  This wire transfer was reflected in a Milex statement issued by Penn Financial.  (Exs. C-47; N.T. 227-29 – Day 1).

76.     This money was paid to cover a portion of attorney Doug Coopersmith's fees for preparing the Milex agreement.  It did not cover any funds represented by check nos. 151 and 154. (N.T. 227 – Day 1).

77.     On May 7, 2003, Kogan was indicted by the United States Attorney's Office for the Eastern District of Pennsylvania and charged with multiple counts of mail and wire fraud.  A Superseding Indictment was returned on June 25, 2003, and a second Superseding Indictment was returned on August 27, 2003, each adding additional charges as the Government discovered additional victims of Kogan's fraudulent scheme.  (Joint Trial Stip. 19).

78.     On September 18, 2003, Kogan entered a guilty plea to the Second Superseding Indictment.  (Joint Trial Stip. 20).

79.     On January 22, 2004, Kogan was sentenced by the Honorable Herbert J. Hutton to a term of imprisonment of 87 months and ordered to make restitution in an amount in excess of $5.6 million.  (Joint Trial Stip. 21).

80.     Morgan brought its third-party claim against Citizens on November 29, 2005.  (Doc.

16

4).

81.     In a letter dated October 26, 2006, Morgan requested from Citizens an indemnification or similar agreement as a result of Citizens's breach of warranty.  (Doc. 57 at Ex. C).

## Conclusions of Law

1.     Under the Pennsylvania UCC's choice-of-law provision, "[t]he liability of a bank [branch] for action or nonaction with respect to an item handled by it for purposes of presentment, payment or collection is governed by the law of the place where the bank [branch] is located."  13 Pa. C.S.A. § 4102(b).  *See also Bank One Dearborn, N.A. v. Wachovia Bank, N.A.*, Civ. A. No. 03-6575, 2005 WL 67073, *2 n.3 (E.D. Pa. Jan. 11, 2005).  In that the transactions involving check nos. 151 and 154 occurred in Pennsylvania, and specifically that the Citizens branch at which Kogan deposited these checks is located in Pennsylvania, we conclude, and, indeed, the parties do not dispute, that Pennsylvania law applies to this case.

## I.     Liability of Morgan to Plaintiffs

2.     In their complaint, Plaintiffs brought a claim against Morgan under 13 Pa. C.S.A. § 4401(a).

3.     Articles 3 and 4 of the Pennsylvania UCC govern the collection and payment of the checks.  *See Bank One Dearborn, N.A. v. Wachovia Bank, N.A.*, Civ. A. No. 03-6575, 2005 WL 67073, *2 (E.D. Pa. Jan. 11, 2005).  To the extent that a check falls within both Article 3 and 4, it is subject to both provisions, with Article 4 controlling in the case of a conflict.  *Id*. at *2 (citing 13 Pa. C.S.A. § 4102(a)).

4.     Under Pennsylvania law, "[a] bank may charge against the account of a customer an

17

item that is properly payable from that account even though the charge creates an overdraft.  An item is properly payable if it is authorized by the customer and is in accordance with any agreement between the customer and the bank."  13 Pa. C.S.A. § 4401(a).

5.    An unauthorized indorsement is equivalent to a forged indorsement, and an instrument is converted when it is paid on a forged indorsement under the UCC.  13 Pa. C.S.A. § 3420(a).  *See also Levy v. First Pennsylvania Bank,* 487 A.2d 857, 861 & n.11 (Pa. Super. Ct. 1985), *overruled on other grounds*, *Springfield Township v. Mellon PSFS Bank*, 889 A.2d 1184 (Pa. 2005). In such a case, the measure of the drawee's liability is presumed to be the amount payable on the instrument.  13 Pa.C.S.A. § 3420(b).

6.    Under 13 Pa.C.S.A. § 4105, a "bank" is defined as "[a] person engaged in the business of banking, including a savings bank, savings and loan association, credit union or trust company."

7.    Brokerage firms offering checking services are considered "banks" for purposes of the UCC.  *See, e.g., Lichtenstein v. Kidder Peabody & Co., Inc.*, 727 F. Supp. 975, 979 (W.D. Pa. 1989), *order vacated on other grounds*, 777 F. Supp. 423 (W.D. Pa. 1991); *Edward D. Jones & Co. v. Mishler*, 983 P.2d 1086, 1093-97 (Or. Ct. App. 1999) (holding that broker-dealer who, among other things, provided its customers with check-writing privileges and monthly account statements and whose name appeared on the actual checks, was a "bank" for purposes of the UCC); *Pinasco v. Ara*, 219 A.D.2d 540, 541(N.Y. App. Div. 1995) (holding that Merrill Lynch was a "bank" for purposes of the UCC because, among other things, it provided customers with a checking account, honored drafts, accepted deposits and forwarded monthly customer statements); *Woods v. MONY Legacy Life Ins. Co.*, 641 N.E.2d 1070, 1071-72 (N.Y. App. Div. 1994) (holding that money market

18

account which provided and retained customers' signature cards, issued a checkbook and sent to customers monthly statements was a bank for purposes of the UCC and rejecting the argument that the "payable through" bank, like Bank One in this case, bore the ultimate responsibility of compliance with the UCC); *Asian International, Ltd. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 435 So. 2d 1058, 1062 (La. Ct. App. 1983) (holding that Merrill Lynch, which provided customers with a general securities and checking account was a "bank" for purposes of the UCC).  As the *Lichtenstein* court explained,

> It would be anomalous to establish one rule for checking accounts administered by a bank, and another rule for checking accounts administered by a brokerage firm in connection with a bank.  The public policy interest in establishing a clear system of rights and liabilities between parties to a commercial transaction is the same in both cases.

727 F. Supp. at 979.  Accordingly, for purposes of this case, and with specific regard to the Active Asset account, Morgan is a "bank."

8.      "Customer" is defined as "[a] person having an account with a bank or for whom a bank has agreed to collect items, including a bank that maintains an account at another bank."  13 Pa. C.S.A. § 4104(a).  Accordingly, for purposes of this case, Plaintiffs are "customers."

9.      "Item" is defined as an "instrument or promise or order to pay money handled by a bank for collection and payment," and includes a check.  13 Pa. C.S.A. § 4104(a).  Accordingly, check nos. 151 and 154 are "items."

10.     Under 13 Pa. C.S.A. § 3104(f)(1), a "check" is defined as "a draft, other than a documentary draft, payable on demand and drawn on a bank."  Accordingly, check nos. 151 and 154 are also "drafts."

11.     "Drawee" is defined as "[a] person ordered in a draft to make payment."  13 Pa.

19

C.S.A. §§ 4104(a), 3103(a).  In this case, Morgan is the drawee in that it is the "person" ordered in check nos. 151 and 154 "to make payment."

12.     A check containing a forged drawer's signature or forged indorsement, or both, is not properly payable.  *See* 13 Pa. C.S.A. § 4401 cmt. 1; *see also Hartford Accident & Indemnity Co. v. First Pennsylvania Bank, N.A.*, Civ. A. No. 86-7363, 1988 WL 11663, *2 (E.D. Pa. Feb. 16, 1988) ("It is well settled that a check bearing a forged indorsement is not 'properly payable' under § 4-401 of the Code."), *aff'd*, 859 F.2d 295 (3d Cir. 1988).

13.     In general, a drawee may not debit the account of its customer for the amount of a check that the drawee paid over a forged indorsement, because such a check is not properly payable. *See J. Walter Thompson U.S.A., Inc. v. Bank of America Corporation*, Civ. A. No. 04-1443, 2006 WL 476995, *3 (S.D.N.Y. Mar. 1, 2006); *see also Hartford Accident & Indemnity Co.*, 1988 WL 11663, at *2.  Under the UCC, a bank breaches its agreements with a customer when it pays the holder of a forged check.  It is this breach which constitutes the customer's cause of action against a bank to recover the sums paid out on checks bearing forged signatures.  *Hardex-Steubenville Corp. v. Western Pennsylvania Nat. Bank*, 285 A.2d 874, 876 (Pa. 1971).

14.     A contract existed between Plaintiffs and Morgan which required that Morgan pay checks drawn by Plaintiffs on their account only in accordance with the orders of Plaintiffs and upon proper and authorized indorsement.  Morgan was not authorized to charge Plaintiffs' account based upon a forged indorsement.  13 Pa. C.S.A. § 4401.

15.     As a result of Kogan's forged indorsements, check nos. 151 and 154 were not properly payable, and Morgan is thus liable to Plaintiffs for the payment of these checks, in the amount of $300,000 subject to our consideration of the assertion of certain defenses and the

application of any setoffs.

## II.     Liability of Citizens to Morgan

16.     Pennsylvania's version of the UCC also governs Morgan's claims against Citizens.[7]

17.     "Depository bank" is defined as "[t]he first bank to take an item even though it is also the payor bank unless the item is presented for immediate payment over the counter." 13 Pa. C.S.A. § 4105.  In this case, Citizens is the depository bank.

18.     13 Pa. C.S.A. §§ 4208 and 3417 set out the warranties provided by a depository bank. Specifically, "[i]f an unaccepted draft is presented to the drawee for payment or acceptance and the drawee pays or accepts the draft, the person obtaining payment or acceptance, at the time of presentment, and a previous transferor of the draft, at the time of transfer, warrant to the drawee that pays or accepts the draft in good faith that: (1) the warrantor is, or was, at the time the warrantor transferred the draft, a person entitled to enforce the draft or authorized to obtain payment or acceptance of the draft on behalf of a person entitled to enforce the draft; (2) the draft has not been altered; and (3) the warrantor has no knowledge that the signature of the purported drawer of the

---

[7] As the basis for the assertion of its claims against Citizens, Morgan, at trial and in its post-trial submissions, appears to rely exclusively upon Count II of its third-party complaint, which alleged a breach of presentment warranties as set out in 13 Pa. C.S.A. §§ 4208 and 3417 (Doc. 4 at 8-9). (*See, e.g.*, Doc. 56 at 14-18; Doc 57 at 14-17).  In Count I of its third-party complaint, Morgan alleged a breach of transfer warranties as set out in 13 Pa. C.S.A. §§  4207 and 3416.  (Doc. 4 at 7-8).  While we note that these two provisions bear a resemblance to the presentment warranty provisions, and may well have some applicability to this case, Morgan has nowhere in its post-trial submissions suggested how they might be applicable or provide any relief not otherwise provided for in its Count II presentment warranty claim.  It appears to us that Morgan has abandoned this claim.  We treat it as such.  Finally, in Count III of its third-party complaint, Morgan alleged a common law claim for indemnity/contribution.  (Doc. 4 at 10).  In that this claim arises out of the same set of operative facts as Count II, and seeks damages for the same loss, we consider it to be merged into the §§ 4208 and 3417 claim.  Accordingly, we only address the applicability of these provisions.

draft is unauthorized.  13 Pa. C.S.A. § 4208.  *See also* 13 Pa. C.S.A. § 3417 (setting out virtually identical warranties).

19.     "Subsection (a)(1) [of § 3417] in effect is a warranty that there are no unauthorized or missing indorsements."  13 Pa. C.S.A. § 3417 cmt. 2.  Likewise, the warranty set forth in 13 Pa. C.S.A. § 4208(a)(1) "really boils down to the statement 'no forged indorsements here.'" 2 *White & Summers, Uniform Commercial Code* § 18-7 at 234 (4th ed. 1995).  Citizens, as the depositary bank, is therefore the entity providing the warranties set out in 13 Pa. C.S.A. §§ 4208 and 3417.

20.     If a depositary bank breaches a presentment warranty to a drawee, "[a] drawee making payment may recover from [the depositary bank] damages for breach of warranty equal to the amount paid by the drawee."  13 Pa. C.S.A. § 4208(b).  Additionally, "the drawee is entitled to compensation for expenses and loss of interest resulting from the breach."  *Id.*

21.     Citizens has not argued, and there is nothing in the record to suggest, that Morgan failed to "pay[] or accept[] the draft in good faith."  13 Pa. C.S.A. §§ 4208, 3417.  We conclude that Morgan did accept and pay the drafts in good faith.

22.     In accepting the forged drafts and presenting them to Morgan for payment, Citizens breached the presentment warranty and is thus liable to Morgan in the amount of $300,000 subject to our consideration of the assertion of certain defenses and the application of any setoffs.

**III.   Citizens's Defenses**

23.     Comment 6 to 13 Pa. C.S.A. § 3417 provides that "[s]ubsection (c) applies to checks and other unaccepted drafts" and gives the "warrantor the benefit of rights that the drawee has against the drawer under Section 3-404, 3-405, 3-406, or 4-406."  We conclude that Citizens, as the warrantor, may raise any defense against Plaintiffs that is otherwise available to Morgan.

_____(A)     Contributory Negligence

24.     13 Pa. C.S.A. § 3406(a) provides that "[a] person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument . . . ."  This provision essentially creates a "conditional estoppel" shielding a bank from liability where a plaintiff's negligence substantially contributes to the forgery. *Menichini v. Grant*, 995 F.2d 1224, 1234 (3d Cir. 1993) (*citing Commonwealth v. National Bank & Trust Co.*, 364 A.2d 1331, 1333 (Pa. 1976)).

25.     "Conduct 'substantially contributes' to a material alteration or forged signature if it is a contributing cause *of the alteration or signature* and a substantial factor in bringing it about." *Lichtenstein v. Kidder, Peabody & Co.*, 840 F. Supp. 374, 387 (W.D. Pa.1993) (*citing* J.J. White & Robert S. Summers, *Uniform Commercial Code, Negotiable Instruments and Funds Transfers Revised Articles 3 and 4 and Article 4A*, 3d ed., Vol. 1B, p. 70 (1991)) (emphasis in original). Further, "only negligence which proximately relates or contributes to the forgery, *and not merely to the issuance of the checks*, would relieve a collecting bank of liability for improper payment of a fraudulently endorsed check."  *The Bank/First Citizens Bank v. Citizens & Assocs.*, 82 S.W.3d 259, 265 (Tenn. 2002) (emphasis in original) (*quoting Vectra Bank v. Bank W.*, 890 P.2d 259, 263 (Colo. Ct. App. 1995)).

26.     Additionally, under 13 Pa. C.S.A. § 3406(c), the "burden of proving failure to exercise ordinary care is on the person asserting the preclusion."

27.     Check Nos. 151 and 154 are instruments.  13 Pa. C.S.A. § 3104.

28.     The fraudulent indorsements of check nos. 151 and 154 are alterations for purposes

of 13 Pa. C.S.A. § 3406(a).

29.     Citizens has argued that Nisenzon was less than diligent in the exercise of his judgment to entrust Kogan with investment funds.  As Citizens points out (*see* Doc. 58 at 17-19), there were arguably circumstances which might have raised concerns for the prudent investor as Nisenzon worked with Kogan in the handling of his father-in-law's account.  (*See* FF 20-24).  It is not, however, appropriate for us to draw conclusions based upon the clarity that comes with hindsight.  We must consider, rather, whether Nisenzon's judgment, clouded by the lure of attractive returns and influenced by the recommendation of Morgan's trusted broker, would be deemed to constitute contributory negligence and which could be said to have "substantially contribut[ed] to a material alteration of the forged instrument."  *Lichtenstein*, 840 F. Supp. at 387.

30.     We recognize that Citizens also argues that Nisenzon's failure to discover the fact that Kogan's license had been suspended is evidence of his failure to exercise ordinary care.  We find that there was little reason for Nisenzon to have questioned the validity of Kogan's license certificates, which were actually shown to him by Kogan, particularly given the  recommendation of Kogan by Margolin, who had the reputation of Morgan Stanley behind her.  (*See* FF 22).  Nisenzon's investment and continued dealing with Kogan, done in reliance upon Margolin's recommendation and upon Kogan's subsequent representations that he had all necessary licenses and that such licenses were in good standing did not amount to a failure to exercise ordinary care.

31.     To the extent that Citizens infers that Nisenzon issued check nos. 151 and 154 despite knowledge that Kogan's license had been suspended, we note that Nisenzon did not discover Kogan's license suspension until *after* the issuance of check nos. 151 and 154.  This fact cannot then be said to have substantially contributed to the loss that resulted from the issuance of these checks

24

or to the fraudulent indorsement of these checks.

32.     Even if Nisenzon's continued dealing with Kogan could be said to constitute a failure to exercise ordinary care, it could not be said to have been "a contributing cause *of the alteration or signature* [of the checks] and a substantial factor in bringing it about." *Lichtenstein*, 840 F. Supp. at 387 (emphasis in original).

33.     Citizens has failed to meet its burden under 13 Pa. C.S.A. § 3406(c) and may not avail itself of this defense.

　　　　**(B)     Padded Payroll**

34.     13 Pa. C.S.A. § 3405(b), referred to in the parties' submissions as the "padded payroll" defense, provides that "if an employer entrusted an employee with responsibility with respect to the instrument and the employee . . . makes a fraudulent indorsement of the instrument, the indorsement is effective as the indorsement of the person to whom the instrument is payable if it is made *in the name of that person*." (emphasis added).[8]

35.     For purposes of considering this defense, we assume, without expressly deciding, that Kogan, as a Member of LAC with Nisenzon and possessing certain express and inherent authority as a result of this status, was an employee of Nisenzon's.

36.     Nisenzon entrusted Kogan with responsibility with respect to check nos. 151 and 154,

---

[8] Relying upon Massachusetts caselaw interpreting an older version of UCC § 3405 from 1988 and upon an older version of 13 Pa. C.S.A. § 3405, respectively, Citizens (Doc. 58 at 13) and Plaintiff (Doc. 60 at 14) articulate this defense as follows:  "an endorsement by any person in the name of a named payee is effective if . . . (c) an agent or employee of the maker or drawer has supplied has supplied him with the name of the payee intending the latter to have no such interest."  In that this articulation fails to apply the current version of 13 Pa. C.S.A. § 3405, we do not apply the test as articulated by the parties.  We do note, however, that our conclusion would not change even if we did apply this approach, as the endorsement of check nos. 151 and 154 was not in the name of the named payee.

which were issued by Nisenzon and made payable to FISERV.

37.     Kogan subsequently made a fraudulent indorsement of those checks by marking them "For Deposit Only" into the bank account of his own company, Kogan & Company, Inc.

38.     As the indorsement simply stated "For Deposit Only" into Kogan's own company's bank account, it was not indorsed in the name of FISERV, the person to whom the checks were payable.

39.     Therefore, 13 Pa. C.S.A. § 3405, which sets out the "padded payroll" defense, does not apply to the facts of this case and does not relieve Citizens of liability.

40.     Under Section 9 of the Uniform Fiduciaries Act, adopted in Pennsylvania at 7 P.S. § 6393, a bank is shielded from the misappropriation of checks deposited by a fiduciary payable to his *principal* into his own bank account.  *Springfield Twp. v. Mellon PSFS Bank*, 889 A.2d 1184, 1187-88 (Pa. 2005).  Specifically, this section provides,

> If a fiduciary makes a deposit in a bank to his personal credit of checks . . . *payable to him as fiduciary*; or of checks *drawn by him* upon an account in the name of his principal, if he is empowered to draw checks thereon; or of checks *payable to his principal* and indorsed by him, if he is empowered to indorse such checks . . . the bank receiving such deposit is not bound to inquire whether the fiduciary is committing thereby a breach of his obligation as fiduciary, and the bank is authorized to pay the amount of the deposit, or any part thereof, upon the personal check of the fiduciary, without being liable to the principal . . . .

7 P.S. § 6393 (emphasis added).

41.     Check Nos. 151 and 154 were drawn by Nisenzon, not Kogan, and made payable to FISERV Securities Inc.  Neither check was made payable to Kogan as fiduciary, and, likewise, neither check was made payable to LA Commodities, the principal.

42.     Therefore, 7 P.S. § 6393 does not apply to the facts of this case and does not relieve

Citizens of liability.

_____(C)_____**Intended Payee**

43.     A common law exception to a bank's liability for payment on a forged indorsement, known as the "intended payee" defense, exists when the proceeds of that instrument have reached the intended beneficiary of that instrument.  *See, e.g., Ambassador Financial Services, Inc. v. Indiana Nat'l Bank*, 605 N.E.2d 746, 752 (Ind. 1992).

44.     Relying principally upon *Ambassador*, *supra.,* the parties generally agree (Doc. 58 at 9-10, Doc. 59-61 at 7) that in order to assert the intended payee defense successfully, a bank must prove the following elements:  (1) the proceeds of the check reached the person intended by the drawer to receive them; and (2) the drawer has suffered no loss or adverse effect on his rights in the transaction that was proximately caused by the bank's improper payment.  *Id.* at 754.  *See also Buse v. Vanguard Group of Inv. Cos.*, Civ. A. No. 91-3560, 1996 U.S. Dist. LEXIS 19033, *29-*31 (E.D. Pa. Dec. 23, 1996) (accepting and applying the elements of this defense as set out in *Ambassador*). Given the parties' agreement, we approach a resolution of this issue with a consideration of these two elements.

45.     Citizens asserts that the first element of the defense has been met because all of the proceeds of check no. 151 and a portion of the proceeds of check no. 154 did, in fact, reach FISERV, the entity intended to receive them.

46.     In support of this proposition, Citizens points out that there was a wire transfer of $200,000, the very same amount as check no. 151, going from Citizens Account No. 6101653211 in the name of Kogan & Company, Inc. to PNC Bank, N.A. for the benefit of FISERV Securities, to be credited to Account No. 51752073 in the name of EAP, and that this wire transfer occurred

27

only six days after check no. 151 was deposited into the same Kogan & Company account at Citizens.   (FF 38-40).  We accept that, with respect to this check, there is strong circumstantial evidence that the $200,000 proceeds, in fact, reached the intended payee while noting that the account in which the proceeds ended up was Account No. 51752073, the account controlled by Kogan in the name of EAP, rather than the LAC account where Nisenzon actually intended the check to be deposited (*see infra* at CL 60).

47.      Citizens also points out that $3,500 was wire-transferred from Citizens Account No. 6101653211 in the name of Kogan & Company, Inc. to PNC Bank, N.A. for the benefit of FISERV Securities, to be credited to Account No. 51752073 in the name of EAP, on the same day that check no. 154 was deposited into the Kogan & Company account at Citizens.  (FF 47-49).

48.      Given the circumstance that the $200,000 wire transfer from the Kogan & Company account to FISERV was precisely the same sum as check no. 151 from Nisenzon, and given the close temporal proximity between the deposit and the transfer, we conclude that the proceeds of this check did reach FISERV, "the person intended by the drawer to receive." *Ambassador*, 605 N.E.2d at 754. *See also* N.T. at 44 – Day 1 (Q:  "Who is the payee on the check?" A:  "Fiserv Securities.").

49.      We are not prepared, however, to draw the same conclusion with respect check no. 154 in the amount of $100,000, and the $3,500 wired from Kogan & Company to FISERV.  The difference between these figures is simply too large to conclude that the $3,500 proceeds are part of the proceeds of the $100,000.  Further, we note that the Kogan & Company, Inc. account at Citizens, both before and after the deposit and the subsequent transfer, possessed sufficient proceeds to fund the transfer.  (Exs. C-32, P-28 (showing average monthly balance from November 1 through November 31, 2002 of $47,374.85)).  The evidence is thus simply insufficient for us to find a

connection between the deposit of check no. 154 and the subsequent wire transfer of $3,500.

50.     While we accept the proposition that the $200,000 proceeds from check no. 151 did, in fact, reach FISERV, we are compelled to next consider the question of whether the party asserting the defense must also prove that the check proceeds were actually applied by the payee for the purpose intended.  We note that the *Ambassador* court declined "to incorporate into the defense the requirement that a defendant prove that the check proceeds were actually applied by the payee for the purpose intended."  605 N.E.2d at 754.  On the other hand, a number of other courts have held that a bank which shows that the proceeds reached the intended payee nonetheless may not avail itself of this defense where those proceeds were not applied by the payee for the purpose intended by the drawer.  *Tonelli v. Chase Manhattan Bank, N. A.*, 363 N.E.2d 564, 567 (N.Y. 1977).  *See also Hillsley v. State Bank of Albany*, 24 A.D.2d 28, 31 (N.Y. App. Div. 1965) (finding that defense failed, despite fact that check proceeds reached intended payee, in that the check's funds were not applied for the purpose indicated on it); *First City Nat'l Bank v. Federal Deposit Ins. Corp.*, 782 F.2d 1344, 1348 (5th Cir. 1986) (holding that bank was not only required to show that funds reached intended payee but also that the proceeds of the check be applied to the purpose intended by the drawer); *Colonial Pacific Corp. v. Connecticut Nat'l Bank*, No. 90-35652, 1992 U.S. App. LEXIS 318, *4 (9th Cir. Jan. 6, 1992) (bank is not liable if funds reached intended payee for the intended purpose); *Pamar Enters. v. Huntington Banks*, 580 N.W.2d 11, 16-17 (Mich. Ct. App. 1998) (defendant bank's liability is reduced to the extent that intended payee received the proceeds of the check applied to the specific obligation the check was intended to discharge).

51.     We recognize and understand the parties' reliance on *Ambassador*, as the opinion contains an extensive and well-reasoned analysis of the history and rationale behind the defense.  As

that court has recognized, the intended payee defense is an equitable "mitigation of damages defense [which] is aimed at preventing unjust enrichment, and it exists to prevent a payee from recovering on a forged endorsement to the extent the payee did not suffer damages in the transaction." 605 N.E.2d at 752. Although the *Ambassador* court ultimately declined to specifically incorporate application of funds to the purpose intended by a check's drawer as an element of this defense, it nonetheless conceded that this issue "might be relevant in the determination of whether the drawer suffered a loss in the transaction" and that it could "envision circumstances in which the defense is not available notwithstanding proper application of the funds, and in which the defense is available notwithstanding the fact that the funds were not used for the purpose intended." *Id.* at 754. The court further conceded that a defendant raising this defense needed to show "that the check proceeds were applied as the payee intended because otherwise the defense would have 'the effect of allowing the tortfeasor to dictate to the true owner how his property is to be used.'" *Id.* at 752 (citing *Yeager & Sullivan, Inc. v. Farmers Bank*, 317 N.E.2d 792, 799 (Ind. Ct. App. 1974)). In this sense it can properly be said that the *Ambassador* decision contains a somewhat puzzling inconsistency.

52. In *Yeager*, one of the cases relied upon by the *Ambassador* court, the court recognized that "'[t]he essence of every conversion is the wrongful invasion of the right to, and absolute dominion over, property owned, or controlled, by the person deprived thereof, or of its use and benefit.'" 317 N.E.2d at 799 (citing *Seip v. Gray*, 83 N.E.2d 790, 792 (Ind. 1949)). Relieving a bank of liability based on the mere showing that the funds reached the intended payee without also showing that "the application [of the converted funds] was to the specific use the converted property was to be put, [would have] the effect of allowing the tortfeasor to dictate to the true owner how his property is to be used," which would, in turn, undermine the essence of conversion law. *Id.* The

30

court thus concluded that a bank was required "to establish that the converted proceeds were applied to the specific debt the proceeds were intended to discharge." *Id.* We find this reasoning persuasive particularly in light of the rationale supporting the intended payee defense as articulated in both *Ambassador* and *Yeager* and as it is consistent with the reasoning of *Tonelli*, *Hillsley*, *First City*, *Colonial Pacific* and *Pamar*.

53.     Remedies provided under the Pennsylvania version of the UCC are to be "liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed . . . ." 13 Pa. C.S.A. § 1106(a). A requirement that a bank show that the proceeds of the converted check were applied for the purpose intended by the check's drawer before being given the benefit of the intended payee defense is consistent with this provision.

54.     The second element of the intended payee defense derived from the *Ambassador* decision requires us to determine whether the drawer, Nisenzon, has suffered a "loss or adverse affect on its rights in the transaction that was proximately caused by the bank's improper payment." 605 N.E.2d at 754.

55.     We separate this element into two separate parts. First, we conclude that it is self-evident that Nisenzon has suffered a "loss or adverse affect" by virtue of the circumstance that those funds which did ultimately reach FISERV were not applied for the purpose intended by him as they were credited to Kogan's EAP account and not the LAC account. (*See infra* at CL 60).

56.     The question of causation is not quite so self-evident. Citizens has argued that causation has been established because a previous check from Nisenzon, check no. 132, dated July 25, 2002, which just like check nos. 151 and 154 was made payable to FISERV (in the amount of $200,000.00) and contained the same reference in the memo line ("Acc. No. 517-52073 of LA

31

Commodities, LLC"), was properly negotiated and indorsed by FISERV and credited to Account No. 51742073, even though that account was in the name of EAP and *not* in the name of LAC.  (FF 33-34).

57.     Citizens argues that this demonstrates that check nos. 151 and 154 would have been similarly negotiated and credited by FISERV had they not been misdirected by the fraudulent conduct of Kogan and, in turn, improperly accepted by Citizens.  We are not prepared to say, however, that this fact alone convinces us that check nos. 151 and 154 would have also gone into the same account.  We do not believe that a reliable course of conduct by this financial institution is established by a single incident, particularly where the reference line on both checks contained an inconsistency between the account number and the account name.

58.     We observe that in the context of an inconsistency between an account identified both by number and by name in the *payable line*, the instrument is deemed payable to the person named and not to the person that is the owner of the account identified by the number.  13 Pa. C.S.A. 3110(c)(1).  We are unable to assume, as suggested by Citizens, that FISERV, having the opportunity to indorse these checks, would have continued to ignore the inconsistency between the account number and the account name.   Even a simple inquiry to the maker by FISERV would have likely led to a proper application of the funds.

59.     As Citizens itself  has acknowledged, it has a responsibility under its own internal policies to inspect indorsements on checks.  (Ex. MS-25).  It did not do so.  Indeed, Citizens concedes that when it accepted the fraudulent indorsement, it did so in specific contradiction of its own internal policy which required a teller presented with a check in the amount of $100,000 or more to have the indorsement of that check confirmed by bank management.  (FF 54-55).  While the

misdirection of Nisenzon's funds was initiated by the wrongful conduct of Kogan, Citizens's conduct was a substantial factor in bringing about Nisenzon's loss.  We thus conclude that Plaintiffs have demonstrated a causal relationship between Citizens's conduct and their loss.  Citizens has not satisfied the second element of the intended payee defense.

60.     Nisenzon intended to express his purpose with respect to check nos. 151 and 154 when he wrote on the memo line of these checks the notation "Acc. # 517-52073 of LA Commodities, LLC".  *See* N.T. 44 – Day 1 (Q: "Why did you put that memo in your check?"  A: "Because the Fiserv is big company [sic] . . . I indicate for what account you put money [sic].").  *See also Tonelli*, 363 N.E.2d at 565 (finding that checks which were "marked 'CD'" indicated that they were drawn for the purpose of purchasing certificates of deposit); *Hillsley*, 24 A.D.2d at 29 (finding that a check bearing the notation "Re: Mooney" on its face indicated that the check's proceeds were to be applied "toward the Mooney house ").

61.     Although this notation contained a clear inconsistency given the fact that Account No. 517-52073 at FISERV and the LAC account at FISERV were, in fact, two separate accounts, we have no doubt that Nisenzon intended the funds to benefit the LAC account, the entity of which he was a member, *not* Account No. 517-52073, which belonged to EAP, an entity controlled by Kogan and in which Nisenzon had no interest.

62.     No funds represented by check nos. 151 or 154 reached the LA Commodities account at FISERV, and the funds were therefore not applied to achieve Nisenzon's purpose in issuing the checks.  Therefore, even if it had met the second element of the intended payee defense, which it has not, Citizens has failed to show that the proceeds of check nos. 151 and 154 were applied for the purpose intended by Nisenzon.  Citizens is not, therefore, entitled to the benefit of this defense.

_____(D)    **Failure to Mitigate Damages**

63.    In Pennsylvania, as a general matter of contract law, a plaintiff has a duty to make a reasonable effort to mitigate damages upon a defendant's breach of contract.  *Bafile v. Borough of Muncy*, 588 A.2d 462, 464 (Pa. 1991).

64.    Failure to mitigate is an affirmative defense in Pennsylvania, and so the burden is on a defendant to prove that a plaintiff failed to make a reasonable effort to mitigate damages.  *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1448 (3d Cir. 1996).

65.    Specifically, a defendant is required to show: (1) what reasonable actions the plaintiff ought to have taken, (2) that those actions would have reduced the damages, and (3) the amount by which the damages would have been reduced.  *Id.*

66.    In support of its argument that Plaintiffs failed to mitigate their damages, Morgan merely states that they failed to promptly notify it of the fraud committed upon their account.

67.    To the contrary, however, the record reveals that Nisenzon did, in fact, notify Ilana Margolin, their broker at Morgan, about the possibility of fraud with regard to his funds, and that he did, in fact, request Morgan to attempt to have his Penn Financial account funds transferred to Morgan.

68.    Morgan also argues that had it been properly informed, it "could have conducted an investigation into the fraud and potentially assisted plaintiffs in recovering their funds."  (Doc. 56 at 19).  Morgan fails to show, however, that any different or additional actions would have reduced Plaintiffs' damages, and likewise fails to show the amount by which the damages would have been reduced.  Morgan has not, therefore, met its burden in establishing this defense.

69.    Citizens has not independently raised failure to mitigate as a defense in any of its

papers.  Like Morgan, it may not benefit from this defense.

      **(E)**    **Doctrine of Laches**

70.    In Pennsylvania, the doctrine of laches may be raised as an affirmative defense and be applied to bar relief where a "plaintiff's dereliction indicates a lack of due diligence in failing to institute an action" and the defendant is, in turn, prejudiced as a result of the lapse of time. *Commonwealth ex rel. Baldwin v. Richard*, 751 A.2d 647, 651 (Pa. 2000).

71.    Neither Morgan nor Citizens has shown that Plaintiffs exhibited a lack of due diligence in instituting this action or that they have been prejudiced in any way due to any lapse in time.  Therefore, neither is entitled to the benefit of this defense.

      **(F)**    **Setoffs for Prior Recoveries**

72.    Under applicable Pennsylvania law, "[t]he remedies provided by this title shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed . . . ." 13 Pa. C.S.A. § 1106(a).  Under general contract principles, however, the aggrieved party "is not entitled to be placed in a better position than he would have been in if the contract had not been broken." *Midland Mutual Life Ins. Co. v. Mercy Clinics*, 579 N.W.2d 823, 830 (Iowa 1998) (citing *22 Am. Jur. 2d Damages* § 45 (1988)).

73.    Conversion of instruments is governed by 13 Pa. C.S.A. § 3420. In a conversion action, "the measure of liability is presumed to be the amount payable on the instrument, but recovery may not exceed the amount of the plaintiff's interest in the instrument." 13 Pa. C.S.A. § 3420(b).  Additionally, this provision "does not prohibit the reduction of that amount by a setoff which is otherwise proper." *County Concrete Corp. v. Smith*, 721 A.2d 34, 38 (N.J. Super. Ct. App. Div. 1998).

74.    A court may not allow a person injured by the tortious act of another more than one satisfaction in damages, and thus the injured party may not recover twice for the same injury. *Rossi v. State Farm Auto. Ins. Co.*, 465 A.2d 8, 10 (Pa. Super. Ct. 1983); *see also Essex Ins. Co. v. Chem. Formula LLP*, Civ. No. 05-0364, 2006 U.S. Dist. LEXIS 17314, *21 (E.D. Pa Apr.7, 2006). This rule is based on a theory of fair compensation which holds that duplicative recovery results in unjust enrichment. *Moorhead v. Crozer Chester Med. Ctr.*, 765 A.2d 786, 790 (Pa. 2001) (citing *Rossi*, 318 465 A.2d at 10).

75.    Additionally, as the Supreme Court of Iowa noted in an exhaustive review of decisions from other jurisdictions, an overwhelming majority of jurisdictions have held that the collateral source rule does not apply to breach of contract actions such as this one. *Midland Mutual*, 579 N.W.2d at 830 (citing *Centon Elecs., Inc. v. Bonar*, 614 So. 2d 999, 1004 (Ala. 1993) (noting that "collateral source rule is not applicable to a claim for breach of contract"); *Grover v. Ratliff*, 586 P.2d 213, 215 (Ariz. Ct. App. 1978) (holding that "collateral source rule is a concept of damages in tort cases and does not apply to an ordinary breach of contract case"); *Patent Scaffolding Co. v. William Simpson Constr. Co.*, 256 Cal. App. 2d 506 (Ct. App. 1967) (noting that the collateral source rule "has not been generally applied in cases founded upon breach of contract unless the 'breach has a tortious or wilful flavor'") (citations omitted); *City of Miami Beach v. Carner*, 579 So. 2d 248, 253-54 (Fla. Dist. Ct. App. 1991) (collateral source rule not applicable in pure breach of contract cases; in contract cases, "measure of damages is the plaintiff's injury, rather than the defendant's culpability"); *Amalgamated Transit Union Local 1324 v. Roberts*, 434 S.E.2d 450, 452 (Ga. 1993) (same); *American Fidelity Fire Ins. Co. v. General Ry. Signal Co.*, 540 N.E.2d 557, 568 (Ill. App. Ct. 1989) (noting that "in Illinois, the collateral source rule applies in contract cases only

where there is an element of fraud, tort, or willfulness"); *Corl v. Huron Castings, Inc.*, 544 N.W.2d 278, 286 (Mich. 1996) (holding that "collateral source rule does not apply in cases of common-law contract"); *Hurd v. Nelson*, 714 P.2d 767, 771 (Wyo. 1986) (noting that "payment from a collateral source may satisfy a contractual obligation"); *22 Am. Jur. 2d Damages* § 568 (1988) (listing cases supporting proposition that collateral source rule should not apply in breach of contract cases). *But see Masterson v. Boliden-Allis, Inc.*, 865 P.2d 1031, 1035 (Kan. Ct. App. 1993) (finding collateral source rule applicable to prevent reduction of damage award by amounts of social security and pension benefits received by plaintiff in case involving breach of implied employment contract); *Hubbard Broad., Inc. v. Loescher*, 291 N.W.2d 216, 223 (Minn. 1980) (concluding that collateral source rule "may be invoked in a contract case under the proper circumstances" and noting that in the case at bar the party "would not be overcompensated for his loss" if the rule was employed to prevent a reduction in damages)).

76.     As applied in Pennsylvania, "[t]he principle behind the collateral source rule is that it is better for the wronged plaintiff to receive a potential windfall than for a tortfeasor to be relieved of responsibility for the wrong." *Johnson v. Beane*, 541 Pa. 449, 456 (1995).  This general purpose is less compelling when applied to contract law rather than tort law, however,

> because of the inapplicability of the deterrence factor in such cases and the countervailing principle that "no one should profit more from the breach of an obligation than from its full performance."  Standard principles of contract damages reinforce the notion that the common-law collateral source rule should not apply in breach of contract actions.  Typically, the nonbreaching party's recovery is limited to "the loss he has actually suffered by reason of the breach."  "The measure of damages for the breach of a contract is the amount which would have been received if the contract had been performed."  Thus, damages in the breach of contract setting are intended to be compensatory only, not punitive in nature.  Application of the common-law collateral source rule in contract actions would contravene this principle by awarding the nonbreaching party more damages than necessary to

37

compensate it for the breach.

*Midland Mutual*, 579 N.W.2d at 830 (citing *22 Am. Jur. 2d Damages* §§ 568, 45 (1988)).

77.    Citizens has pointed to evidence which may be construed to show that Plaintiffs have already recovered a portion of the losses which resulted from the issuance of check nos. 151 and 154 and argues that it is entitled to have any such amount set off from the total amount that it might otherwise owe if it is determined to be liable.  Were it not allowed to do so, Plaintiffs would be unjustly enriched and would receive more damages than are necessary to compensate them for their $300,000 loss at issue.

78.    Plaintiffs, in the name of Milex (*see supra* n. 4), submitted a $1,500,000 claim to SIPC.  The $300,000 loss resulting from the issuance of check nos. 151 and 154 was included as part of this claim.  (Exs. MS-18, MS-19; N.T. 5-6 – Day 2).  By letter dated July 12, 2004, SIPC notified Plaintiff Nisenzon that it had allowed the claim but that it capped the recovery at the pre-interest $500,000 limit allowed by statute.  (Exs. MS-18, MS-19).

79.    Check Nos. 151 and 154, which totaled $300,000, comprised 20% of Plaintiffs' $1,500,000 SIPC claim.  We are unable to presume, however, that any of Plaintiffs' $500,000 pre-interest SIPC award was allocated to cover the losses resulting from check nos. 151 and 154 in that no such specific allocations appear in Plaintiff's SIPC documents (*See* Exs. MS-18, MS-19) and, importantly, Plaintiffs would have received the same $500,000 capped statutory limit whether they had included the losses resulting from these checks or not.  Indeed, Plaintiffs would have recovered $500,000 of any properly payable claim of any amount so long as the claims was $500,000 or more.  Accordingly, Citizens is not entitled to any setoff as a result of this recovery.

80.    On or about July 9, 2004, Plaintiffs, together with Georgiy Shukhatian and

International Alternative Service Group, Ltd., were granted permission to intervene in pending litigation, captioned *Alexander Finance C.D. Inc. v. Sirotovsky*, No. 2:02-cv-04977 (E.D. Pa. 2004) (the "Sirotovsky Action").  (Sirotovsky Action Doc. 58 at 21).  These four plaintiffs then filed an Amended Complaint demanding judgment arising out of several transactions in the total amount of $1,800,150.  The two checks at issue in this case were specifically referenced and a part of the claims in the Amended Complaint.  (Sirotovsky Action Doc. 77).  These four plaintiffs received a sum of $241,710.47 as part of a global settlement of the Sirotovsky Action.  (Ex. MS-20 at 333).  The settlement sum was not specifically allocated as to the four plaintiffs or as to their specific claims raised in the Amended Complaint.  (Ex. MS-20).

81.     Check Nos. 151 and 154 (totaling $300,000), comprised 16.67% of these four plaintiffs' total $1,800,150 claim in the Sirotovsky Action.  It is thus appropriate for us to allocate the recovery of these four plaintiffs on the same basis.  This takes us to a figure of $40,293.14, or 16.67% of the $241,710.47 settlement recovery, which represents the amount of the settlement recovery allocated toward check nos. 151 and 154.

82.     On March 17, 2003, Kogan caused a wire transfer to the credit of the LAC Fleet Bank account in the amount of $30,000.  This money was paid to cover a portion of attorney Doug Coopersmith's fees for preparing an agreement setting up an investment fund Nisenzon was considering with Kogan.  It did not cover any funds represented by check nos. 151 and 154.  (Exs. C-47; N.T. 227-29 – Day 1).  Accordingly, Citizens is not entitled to any setoff as a result of this payment.

83.     Under our analysis, then, Plaintiffs have already recovered $40,293.14 of the $300,000 total loss of check nos. 151 and 154 as a result of the settlement of the Sirotovsky Action.

If they were to also recover the full $300,000 total of check nos. 151 and 154 as a result of this action, they would receive a double recovery to that extent and be unjustly enriched. We accordingly conclude that Citizens is entitled to the benefit of a setoff against Plaintiff's recovery in this case for the amount properly allocated to the prior recovery toward check nos. 151 and 154.

84.     Plaintiffs are thus entitled to the difference between $300,000 and $40,293.14, or $259,706.86.

## IV.     Morgan's Right to Recover Compensation for Expenses and Loss of Interest From Citizens

85.     Morgan argues that it is entitled to compensation for expenses and loss of interest from Citizens. It has directed us to 13 Pa. C.S.A. § 4208(b) which states that, "[a] drawee making payment may recover from a warrantor damages for breach of warranty equal to the amount paid by the drawee less the amount the drawee received or is entitled to receive from the drawer because of the payment. In addition, the drawee is entitled to compensation for expenses and loss of interest resulting from the breach." Morgan likewise points to 13 Pa. C.S.A. § 3417(b) which contains a virtually identical provision.

86.     Additionally, Morgan argues that it is entitled to compensation for attorney's fees from Citizens. (Doc. 57 at 17). Comment 5 to 13 Pa. C.S.A. § 3417 which contemplates that attorney's fees "could be granted" under this section because "they fit within the language 'expenses . . . resulting from the breach.'" Subsequent decisions confirm that an award of attorney's fees is discretionary with the trial court. *See, e.g., Pavex Inc. v. York Fed. S&L Ass'n*, 716 A.2d 640, 647 (Pa. Super. Ct. 1998). Morgan has pointed us to caselaw supporting its position and holding that where a drawee bank "is forced to litigate the collecting bank's obligation to indemnify despite the

collecting bank's clear breach of warranty," it is particularly appropriate that the collecting bank be liable for attorney's fees.  (Doc. 57 at 17-18) (citing, among other cases, *Fergang v. Flanagan*, 665 N.Y.S.2d 785, 788 (N.Y. Sup. Ct. 1997)).

87.     Citizens has not addressed Morgan's claims for expenses, interest and attorney's fees. We acknowledge, however, that such issues are typically not decided until after liability has been determined.  Further, Morgan has not provided us with any documentation as to the amounts of such expenses that it argues it is entitled to.  Accordingly, we will allow Morgan 30 days from the date of our Order accompanying the Findings if Fact and Conclusions of Law to provide us with appropriate documentation of such costs, and any further legal justification as to why it is entitled to those costs.  We will allow Citizens, in turn, 20 days from the date of service of Morgan's submission to file a response.

## V.     Conclusion

For the reasons set out in the Court's Findings of Fact and Conclusions of Law:

88.     The Court finds in favor of Plaintiffs and against Morgan on Plaintiffs' merged causes of action for breach of contract and violation of 13 Pa. C.S.A. § 4401 due to the improper charges upon Plaintiffs' account for two fraudulently indorsed checks drawn upon their account in the collective amount of $300,000.00.

89.     The Court further finds in favor of Morgan Citizens on Morgan's third-party cause of action for breach of the presentment warranties under 13 Pa. C.S.A. §§ 4208 and 3417.

90.     The Court further finds that Defendants are entitled to a set off of $40,293.14 on account of sums recovered pertaining to those checks.

An appropriate Order follows.